RICHARD P. STANTON, Claimant, *v.* STATE OF NEW YORK.
No. 2623-A.

(State of New York, Court of Claims, April, 1918.)

Contracts — with state for improvement of highway — when claim dismissed — damages — Laws of 1909, chap. 30.

    Where a contract with the state for the improvement of a highway by the construction of a road of the grouted bituminous macadam type reserves to the state the right to make all such additions to the contract as it deems necessary, making an allowance therefor at the prices named in the proposal for the work, and it is also agreed in and by the contract that any increase of quantities or extra work performed or materials furnished " shall be covered by a supplemental contract as provided by chapter 30 of the Laws of 1909, and amendments thereto " and that " whenever an increase of quantity  *   *   * occurs, then such excess must be agreed upon in writing as provided in chapter 30 of the Laws of 1909 " there can be no recovery for any work performed or materials furnished, unless they were performed pursuant to the provisions of the original or a supplemental contract executed by the state highway commissioner, and no conduct of other employees of the state, or of the contractor himself, or of both, can create an obligation, binding upon the state, for work performed otherwise.

    The contractor has the right to refuse to comply with the directions of an engineer to perform work not within the original or a supplemental contract, but in case he obeys the engineer his act is voluntary and does not bind the state to pay, and where claimant testifies that he knew that a certain item of work was not required by the contract, and that he complied with the engineer's directions to " avoid friction " with the latter, his claim for such work will be dismissed.

CLAIM for the improvement of the highway known as Millbrook Village County Highway No. 1114.

State of New York, Court of Claims, April, 1918.     [Vol. 103.

Elijah T. Russell (James A. Parsons, of counsel), for claimant.

Henry P. Nevins, deputy attorney-general, for state.

CUNNINGHAM, J.   The claimant, on August 1, 1913, made a contract with the state of New York, through the state highway commissioner, for the improvement of the highway known as Millbrook Village County Highway No. 1114, by the construction of a road of the grouted bituminous macadam type.   The claim originally aggregated $6,877.88, with interest from March 15, 1915, but has been duly amended in such manner that the total amount of it is $6,744.29.   It is predicated on the alleged improper and unlawful refusal of the state highway commissioner to include in the final estimate and to allow and pay for various items of work and materials, and for certain alleged changes of materials required by the commissioner in the performance by the claimant of the contract. There are six items and briefly they are as follows:

(1)  That the engineers of the highway department required the claimant to construct the top course 3½ inches thick, whereas the contract provided for such a course 3 inches thick, requiring 400 additional cubic yards of top course macadam at the contract unit price of $4.25 per cubic yard, a total of ........................  $1,700 00

(2)  That the said engineers required the claimant to construct the road 16.4 feet wide, whereas the contract required the road to be 16 feet wide, thus requiring 52.2 additional cubic yards of sub-base at the contract unit price of $1.90, $93.10; and 63 additional cubic yards of sub-base at the

Misc.]     State of New York, Court of Claims, April, 1918.

contract unit price of $1.90 per cubic yard,
$119.70; and 49 additional cubic yards of
top course at the contract unit price of $4.25
per cubic yard, $208.25; a total of........     $421 05
    (3) That the commissioner and his repre-
sentatives refused to allow the use of cer-
tain bituminous material A, which, claim-
ant alleged, complied with the contract
specifications and compelled the claimant to
use certain other bituminous material A,
resulting in an increased cost to the claim-
ant for said material of................     287 80
    (4) That the last mentioned conduct of
the state highway commissioner and his
representatives caused a delay of six weeks
in the completion of the top course, damag-
ing the claimant in the sum of...........     331 00
    (5) That the claimant was induced by the
commissioner and his representatives to
believe, and did believe, that certain local
stone known as shale could be used in the
construction of the sub-base, but that the
latter refused to permit the claimant to use
same and required stone other than the
local stone or shale to be used for sub-base,
resulting in increased cost to the claimant
therefor in the sum of $2,162.24.   That this
alleged improper action on the part of the
state highway commissioner and his repre-
sentatives caused an increase of cost to
claimant for the top course stone of
$1,837.20, a total of.....................     3,999 44
    (6) Printing claim, estimated at........       5 00

       Total ........................     $6,744 29

State of New York, Court of Claims, April, 1918.    [Vol. 103.

## ITEM (1).

Several interesting problems naturally are suggested by this inquiry:

(a) Would this item, if allowed, cause the contract expense to exceed the original estimate? If it would, there could be no recovery without an amendment of the original estimate, as provided by the statute. Highway Law, § 130, subd. 9. There is no evidence on this subject, and the state did not raise the question, so we are not concerned with it.

(b) Is a supplemental contract a necessary prerequisite to recovery for this work? The statute provides that state and county highways shall be constructed or improved " by contract," and " all contingencies arising during the prosecution of the work shall be provided for to the satisfaction of the commission, and as may be agreed upon in the original, or by a supplemental contract, executed by the commission." This would seem to leave no room for recovery for so-called extra work. It is clearly the intention of the statute to provide that there shall be no recovery for work done or materials furnished, unless they are provided for in the original contract, or by a supplemental agreement executed by the commission. The purpose is obvious. It is to prevent the creation of a liability against the state by the conduct of the contractor without, or with, the cognizance and co-operation of state employees, other than the commissioner. The power to increase the amount of work to be done and compensation to be paid is centered in the commissioner, who must act by supplemental agreement if the state is to be obligated. The duty of the contractor is clear. It is to perform his original contract and, if ordered to do more, he has the right to insist on the execution of a supplemental agreement, or he may refuse to comply with any direc-

Misc.] . State of New York, Court of Claims, April, 1918.

tions outside the limitations and purview of his original agreement. This particular contract is consonant with the statutory provision, but is more ample and explicit in its terms. It provides, paragraph 4, page 5, " The state * * * reserves the right to make such additions * * * as it deems necessary, making an allowance * * * therefor at the prices named in the proposal for this work. * * * It is further agreed that any increase of quantities or extra work performed or materials furnished *shall be covered by a supplemental contract as provided in chapter* 30, *Laws of* 1909, *and amendments thereto.*" Again, on page 8 of the " information for bidders " it is stated, " Whenever an increase of quantity * * * occurs, then such excess *must be agreed upon in writing as provided in chapter* 30 *of the Laws of* 1909." The other provisions in the contract, relating to the right of the state to increase quantities, must be construed with these provisions, and mean that the state, through the commission, has the right to require such increase, on the terms stated, to be provided for in a supplemental contract, to be executed by the commissioner and contractor. We conclude that there can be no recovery for any work performed or materials furnished, unless they were performed pursuant to the provisions of the original, or a supplemental, contract executed by the commissioner, and that no conduct of other employees of the state, or of the contractor himself, or of both, can create an obligation, binding upon the state, for work performed otherwise. The contractor has the right to refuse to comply with directions of an engineer to perform work not within his original or a supplemental agreement. If he obeys the engineer in such a case, his act is voluntary and does not bind the state to pay for it. The claimant testified that he knew this item was not required by his contract, but

he complied with the engineer's direction to " avoid friction " with the latter.

(c) Did the contract permit the engineer to increase the thickness of the top course of the road from three to three and a half inches? If there was an actual increase here, then the engineer, as we have shown, had no power to require it, because it would be extra or additional work, requiring a supplemental agreement. The plans and specifications specifically provide for a top course three inches thick. And, further, the " information for bidders " specifically warned the contractor that such work would not be paid for. On page 3, it reads, " No greater depth or width of stone, gravel or other kind of pavement will, however, be paid for than that called for in the plans and specifications."

(d) Does this item include any work for which the claimant has not been paid? We find that the top course did not exceed in thickness the contract requirements, as a matter of fact. The bottom course was necessarily uneven and irregular. If the top course were of uniform thickness, the completed road surface would be uneven. The contract requires a top course three inches thick. That means a *minimum* thickness of three inches. The evidence is all to the effect that to secure a minimum thickness of three inches the top course must be necessarily of varying thickness. Mr. Rapalje, one of claimant's experts, testified that it was exceedingly difficult to secure a uniform thickness of three inches, and the state's witnesses asserted that it was usual to apply a top course of an average thickness of three and a half inches to secure a minimum thickness of three inches. We find that a thickness of three and a half inches was no more than a reasonable and practical compliance with the provisions for a thickness of three inches.

Misc.]     State of New York, Court of Claims, April, 1918.

## ITEM (2).

The evidence discloses no justification for the engineer requiring a width of sixteen and four-tenths feet. There may have been some adequate reason for it, but the evidence permits only the inference that it was arbitrary. However, all of our discussion, except the last paragraph, under Item (1), is determinative of this item, and prevents recovery. The contractor should have refused compliance.

## ITEM (3).

The specifications, page 8, 4A, provide " the fluxed natural asphalt shall be composed of at least 65 per cent of a refined, *natural, solid asphalt,*" etc. The claimant purchased, for this purpose, from the Warner-Quinlan Company, asphalt at ten cents per gallon. The engineer prevented its use, on the ground that it did not comply with the foregoing requirement for a natural, solid asphalt. The claimant was obliged to pay ten and six-tenths cents per gallon, for the asphalt used, which he purchased from the Barber Asphalt Company. He claims that the Warner-Quinlan product complied with the contract, and claims compensation for the damage caused by the refusal to permit its use.

An employee of the latter company testified that the bituminous material A, manufactured by the two companies, were, in their completed state, identical. The Warner-Quinlan material is achieved by refinement, eliminating the volatile oils, and leaving the bituminous material A as the residuum. The Barber product is obtained by the addition of volatile oils to solid, natural asphalt obtained at Bermudez. As finally prepared, each is the equivalent of the other. But at no time, and under no conditions, does a natural solid asphalt enter into the Warner-Quinlan product. The

State of New York, Court of Claims, April, 1918.   [Vol. 103.

Barber product, on the other hand, is composed, in part, of such asphalt. The purpose and good faith of this provision in the specifications is not our concern. No illegality in its insertion has been established. The responsible state officials, for reasons which we assume to be proper, specified a material composed of natural, solid asphalt, and the claimant agreed to furnish it. The Warner-Quinlan product was not such material. The Barber asphalt was. The state required him to do what he had agreed, and nothing more. There was no breach of this contract, and, in its absence, there can be no recovery. Had the work been completed with the Warner-Quinlan asphalt, the claimant would not be entitled to payment for it, in the absence of waiver by the state. That product would not be an exact performance of his contract. The law requires exact performance as a condition precedent to recovery. It is no answer that the material supplied is equivalent or superior to that provided in the contract. The defendant has the absolute right to the thing specified, and need not pay for something which the claimant, his experts, or the court may conclude is equally valuable and useful. *Ward* v. *Kilpatrick,* 85 N. Y. 413; *Spence* v. *Ham,* 163 id. 220; *People* v. *Tompkins,* 186 id. 413; *Schultze* v. *Goodstein,* 180 id. 248; *Easthampton L. & C. Co.* v. *Worthington,* 186 id. 407.

The only exception to this rule arises from the application of the principle of " substantial performance." This principle is of recent growth, and has been evolved by our courts to mitigate the rigors of the rule above stated. It is limited in its application, and is well defined. A party may recover for the performance of a contract not only when he is able to show exact performance, but substantial performance will suffice. In defining substantial performance, the Court of Appeals has said: " It is now the rule, that

Misc.]     State of New York, Court of Claims, April, 1918.

where a builder has in *good faith intended to* comply with the contract, and has *substantially* complied with it, although there may be *slight* defects caused by *inadvertence* or *unintentional* omissions, he may recover the contract price, *less the damage* on account of such defects.'' *Woodward* v. *Fuller,* 80 N. Y. 312, 315. Again, the court has said: '' It is a general rule of law that a party must perform his contract before he can claim the consideration due him upon performance; but the performance need not in all cases be literal and exact. It is sufficient if the party bound to perform, acting in *good faith,* and *intending and attempting* to perform his contract, does so *substantially,* and then he may recover for his work, notwithstanding *slight or trivial defects* in performance, *for which compensation may be made* by an allowance to the other party.'' *Nolan* v. *Whitney,* 88 N. Y. 648, 649. The italics in the foregoing quotations are ours. This principle has been defined and limited, as above, in many other decisions. *Spence* v. *Ham, supra; People* v. *Tompkins, supra; Schultze* v. *Goodstein, supra; Easthampton L. & C. Co.* v. *Worthington, supra; Norton* v. *United States Wood Preserving Co.,* 89 App. Div. 237; *Smith* v. *Ruggiero,* 52 id. 382; *Holl* v. *Long,* 34 Misc. Rep. 1. So we find that the claimant could not recover, were he in this court claiming performance of the contract, under these circumstances, because he could not show exact performance, and the facts negative any contention of *substantial* performance. It is a fundamental essential to recovery for substantial performance, that the failure to perform exactly was inadvertent and unintentional. Here, it would have been wilful and deliberate, and after protest by the state. Furthermore, where a recovery is had for substantial performance, the claimant cannot recover the contract price, but only the contract price less the amount which it

would cost the adverse party to secure or complete exact performance. A party can never profit by his failure to perform exactly. On the contrary, he must compensate the adverse party for his failure. The foregoing is true where the claimant is contending for compensation after alleged performance. The principle of substantial performance has no application whatever in advance of any performance at all. That is, the claimant cannot assert a positive right to omit exact performance, and to make substantial performance in advance of doing the work; much less can he predicate a demand for damages, on a refusal by the state, at that time, to accept a substituted performance in lieu of exact compliance with the contract provisions. See cases cited *supra.*

### ITEM (4).

Our disposition of item (3) is decisive here. The claimant contends that the delay was due to the state's refusal to permit him to use the Warner-Quinlan asphalt. We have found that the state's refusal was justified. The delay was the fault of the contractor. The major part of it was caused by his futile efforts to induce the state to recede from its position. This conduct was voluntary on his part. Furthermore, he admitted that he could have obviated all the loss by proceeding with the laying of the top course during this period, but he did not do it, because he feared people would invade and travel on the road and injure it. He was obliged to take all reasonable means to minimize or obviate his damage. His reason for doing it is inadequate, in view of the fact that, pursuant to the statute (Highway Law, § 77), the county engineer had closed the highway to traffic, and any one using it was guilty of a misdemeanor, and that it was claimant's duty, under the contract, to prevent such intrusion and to protect his work. The contract provides,

paragraph 5, page 5, that " all work shall be at the contractor's risk until it has been finally accepted."

## ITEM (5).

The " information for bidders," page 5, paragraph 1, states that the contractor will be required to lay the specified wearing surface " on a sub-base bottom course of *approved stone*." Paragraph 1, page 2, 4A of the specifications provides, "All stone to be approved by the chief engineer before being used." Paragraph 1, page 3, 4A of the specifications provides that the bottom course shall be " of stone satisfactory to the commissioner of highways."

Certain shale rock had been used for sub-base bottom course in two other roads in the vicinity, of which the contractor had knowledge. He did not obtain the approval of this shale, for use in connection with this contract, either before he bid or executed the contract, or at any other time. There is no evidence that this shale ever was " approved," or " satisfactory," to the engineer, or to the commission, in connection with this work. The claimant merely assumed that, because it had been used on some other state or county roads, it could be used here, and made his bid upon that assumption. He attempted to prove that it was proper material, but his witnesses admitted that, although roads in which it had been used have given, thus far, satisfactory results, it is not, in their opinion, or in that of engineers generally, either the best material, or material as good as field stone, or similar rock. Obviously, the fact that it had been used elsewhere did not bind the state to permit its use here;— nor was it an approval of the stone for the purposes of this contract. It was necessary that the claimant use stone approved by the commissioner, and the shale

never was.  The state had the right to require what the
contract provided, not stone which the claimant, or
his experts, or the court, might think good enough, or
equivalent to that provided.  See cases cited under
item 3.  The claimant was not required to do anything
beyond his contract obligation — that is, use stone
approved by the proper officer.  Unfortunately for him-
self, he assumed that approval would be given to the
shale, but the risk of such assumption was his.  There
was nothing harsh in the action of the department.
The claimant could have protected himself, by securing
approval of stone for this purpose before he bid, and,
if unable to do so, by making his bid in such an amount
as would secure him against the contingencies
involved.

But even had the shale been approved, the commis-
sioner had the right to discontinue its use and require
other stone, and the claimant would have no right to
additional compensation because of such action.  Para-
graph 1, page 2, 4A of the specifications, provides
" If after trial it is found that partially developed
quarries, ledges, or other sources of supply do not fur-
nish a uniform product, or if for any reason, the
product from any source, at any time, proves to be
unsatisfactory to the chief engineer, he may decline to
continue its use and may require the development of
other quarries, or the commission may require the
contractor to furnish other sources of supply and the
contractor will have no claim for increased payment on
account of such requirement."  This provision of the
specifications must be presumed to have been in the
contemplation of the claimant, when he made his bid
and fixed the amount of it — and he assumed the bur-
den which such action by the commissioner might
impose.  The evidence discloses no misrepresentation
on the part of the state, or any of its officers.  If the

Misc.]   State of New York, Court of Claims, April, 1918.

claimant has suffered loss in connection with this item, it was due to his error in judgment.

This reasoning disposes of this entire item, for if the action by the state, in rejecting the shale and requiring the use of other stone for the sub-base bottom, was proper, there can be no recovery for that change, nor for the additional cost which accrued to the claimant, in connection with the top course stone as well.

## ITEM 6.

There is no legal authority for the allowance, by this court, of the costs of printing claims. The claim, therefore, must be dismissed.

ACKERSON, P. J., concurs.

Claim dismissed.